IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
CHARLOTTE DIVISION

| | |
|---|---|
| BERKSHIRE GROUP LP, | ) |
| Plaintiff, | ) |
| v. | ) **COMPLAINT** |
| SOMPO INTERNATIONAL HOLDINGS LTD., d/b/a SOMPO INTERNATIONAL INSURANCE, | ) |
| Defendant. | ) |

**COMES NOW** Plaintiff Berkshire Group LP, complaining of Defendant Sompo International Holdings Ltd., d/b/a Sompo International Insurance, and alleges and states as follows:

## Nature of Action

1. This case is an action for declaratory judgment under Rule 57 of the Federal Rules of Civil Procedure and 28 U.S.C. § 2201 to declare the rights and other legal relations surrounding questions of actual controversy that presently exist between Plaintiff Berkshire Group LP ("Berkshire") and Defendant Sompo International Holdings Ltd., d/b/a Sompo International Insurance ("Sompo") in connection with Berkshire's claim under a policy of insurance issued by Sompo which Sompo has denied.

## Parties

2. Berkshire is a Delaware limited partnership with its principal office in located at One Beacon St, Suite 2400, Boston, Massachusetts, 02108.

3. Berkshire is a vertically integrated residential investment management and property operations company that owns and operates multi-family apartments throughout

the United States. Berkshire is the named insured on a policy of insurance issued by Sompo that covers and includes the property at issue herein.

4. Sompo is a wholly-owned subsidiary of Sompo Holdings, Inc., which is a corporation with its principal United States office located in New York, New York.

5. Upon information and believe, Sompo is a foreign insurer that is licensed to issue insurance in North Carolina and, as such, Sompo may be served through the North Carolina Commissioner of Insurance, its statutorily appointed agent for service of process in North Carolina pursuant to N.C.G.S. § 58-16-30.

## Jurisdiction and Venue

6. This action seeks a declaration of the rights and obligations of the parties in connection with a policy of insurance that covers the property generally known as the Berkshire Dilworth Apartments, located at 1351 East Morehead Street in Charlotte, Mecklenburg County, North Carolina (the "Property").

7. A copy of the policy of insurance (the "Policy") at issue herein and issued by Endurance American Specialty Insurance Company, a member of the Sompo international companies, as insurer, to Berkshire, as named insured, is attached hereto as Exhibit "A" and incorporated herein by reference.

8. The Property is included in the "Scheduled Locations" endorsement within the Policy.

9. Venue is proper in this District pursuant to 28 U.S.C. § 1391 because a substantial part of the events or omissions giving rise to the claim occurred herein and the Property that is the subject of the action is situated herein.

10. Pursuant to the Policy, in the event of the failure of Sompo to pay any amount due to be claimed under the terms of the Policy, Sompo agreed to submit to the jurisdiction of a court of competent jurisdiction within the United States.

11. Pursuant to the Policy, Sompo agreed that that service of process could be made upon Sompo care of the Senior Vice President – Claims, 1221 Avenue of the Americas, 19th Floor, New York, New York, 10020.

12. The Court has jurisdiction over this action pursuant to 28 U.S.C. § 1332 because the matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs, and is between citizens with principal places of business and centers of operations, direction, and control in different states.

13. This Court also has jurisdiction pursuant to 28 U.S.C. § 2201, in that Berkshire is seeking a declaration from this Court regarding the parties' rights and obligations with respect potential coverage under an insurance policy issued by Sompo.

14. This action has been filed within all applicable statutes of limitation and/or repose.

15. All conditions precedent to the filing of this action have been satisfied, have been performed, or have been waived.

## The Property and the Policy

16. The Property is a multi-story, 296-unit apartment complex with underground parking; a ground floor with a leasing office, amenities, and a few apartments; and upper-story apartments on the third through sixth floors.

17. Construction of the Property was substantially completed in May 2016. At the time of its completion, the Property was owned by Berkshire subsidiary BMPP

Dilworth Limited Partnership. By agreement dated July 2, 2019, ownership of the Property was transferred to PBOne Dilworth LP ("PBOne"). Concurrently, management of the Property was and is now performed by Berkshire Communities, L.L.C., a subsidiary of Berkshire.

18. As designed and originally constructed in approximately June 2016, the roof assembly for the Property above the sixth floor consisted of (from top to bottom) an adhered thermoplastic polyolefin (TPO) single-ply roof membrane, gypsum coverboard, and wood sheathing. The wood sheathing was supported on wood trusses, which sloped from the street-facing elevations to scuppers in the parapet walls of the rear elevations. The foregoing is collectively referred to as the "Original Roof." The Original Roof did not include a vapor retarder.

19. The sealed, nonventilated interstitial space below the Original Roof and above the gypsum ceiling for the sixth floor (hereinafter, the "Roof Cavity") was designed to have the space fully filled with blown-in noncombustible fiberglass insulation.

20. Sompo issued the claims-made insurance policy attached hereto as Exhibit "A" entitled "Site Environmental Impairment Liability Coverage," Policy #: GER10010927401, with effective dates from April 1, 2020 to April 1, 2023 (previously and hereinafter referred to as the "Policy").

21. An endorsement within the Policy entitled "Schedule Locations," Form EIL 0102 0816, amends Item 5 of the Policy Declarations and identifies the Property one of multiple properties across the United States that is covered by the Policy.

## The Facts Giving Rise to Berkshire's Claim Against Sompo

22. In or about October 2020, during routine maintenance inspections, Berkshire's maintenance personal discovered multiple instances of unusual standing/ponding water on the Original Roof, as well as a large ridge across the roof centered above the 3-hour firewall for the building.

23. Berkshire's experts walked the Original Roof and also identified multiple soft spots in the roof decking.

24. Berkshire's experts investigated the problems with the roof by, among other things, making exploratory openings through the top of the roof deck and exploratory openings above the gypsum ceilings of the sixth floor into the Roof Cavity.

25. During the course of the referenced investigations, Berkshire's experts determined that the softs spots were locations where the roof coverboard had deteriorated and lost its integrity due to moisture degradation.

26. Berkshire's experts confirmed that the Original Roof was watertight such that there was no evidence of water intrusion into the Roof Cavity from the exterior.

27. After reviewing the project plans for the Original Roof, Berkshire's experts concluded that the designer of the Original Roof (BB&M Architecture, PLLC) had failed to account for dew point condensation that would form within the Roof Cavity as a result of temperature differentials within the Roof Cavity and between the roof assembly and the exterior.

28. Unlike roof leaks where water enters a roof assembly and spreads outwards, diminishing from the point of the water intrusion, the damage from the

condensation within the Roof Cavity was widespread, including in the "ridge" or high parts of the roof.

29. The damage sustained by the Original Roof was such that it could not be repaired. Consequently, Berkshire's experts concluded that that the entire Original Roof would have to be replaced.

30. In addition to the damage to the Original Roof, Plaintiff's experts also discovered microbial growth on the roof decking (sheathing) of the Original Roof and on many of the trusses within the Roof Cavity.

31. The microbial growth on the trusses within the Roof Cavity required remediation before the Original Roof could be replaced.

32. The microbial growth on the roof decking (sheathing) of the Original Roof with rare exceptions could not be remediated, as any such decking with microbial growth was typically compromised by moisture and had to be replaced.

33. On or about June 28, 2021 (and as amended on July 19, 2021), Berkshire's experts issued bid plans and a project manual for a replacement roof project that included, among other things, (a) removal and disposal the Original Roof and portions of the blown-in insulation, (b) remediation of microbial growth within the Roof Cavity, and (c) installation of new sheathing and roofing components for the replacement roof, including the addition of a vapor barrier that was not included with the Original Roof (collectively hereinafter referred to as the ("Roof Replacement Project").

34. On or about June 30, 2021, Berkshire issued an invitation to bidders to bid on the Roof Replacement Project. For bid comparison purposes, the bidders were instructed to include an allowance of $500,000 for microbial growth abatement. Three (3)

bids were received on July 30, 2021, and Sorjen, Inc.'s ("Sorjen") bid was selected as the lowest, most responsive bid.

35. Or about September 16, 2021, PBOne and Sorjen entered into a contract for the Roof Replacement Project. The contract amount of $3,449,000.00 included a $500,000.00 "Contract Placeholder" for the microbial growth remediation that would ultimately and actually be billed on a time and material basis.

36. In or about October 2021, the Roof Replacement Project commenced with a schedule target completion date of April-May 2022. Generally speaking, the project was completed in sections each day to ensure the roof remained watertight from day-to-day.

37. Each day, the contractor would begin by removing variable-sized sections (typically, approximately 600 s.f.) of the Original Roof and corresponding portions of the blown-in insulation. If microbial growth was identified after a particular section of roof was opened, remediation was accomplished by a four-person crew using safety harnesses who were lowered over the existing framing. This crew would clean and wipe down the wood trusses with anti-microbial solution and lock-down encapsulate, as needed. They operated on a stand-by basis as the roof was opened. Costs for this microbial growth cleanup activity were tracked separately from the roof replacement project.

38. Once any necessary microbial growth remediation was completed, new wood sheathing was installed, along with the new vapor barrier, and a new TPO membrane was added to enclose the section of roof that had been opened that day.

39. Sompo's representatives were given access to the Property to observe and monitor a typical roof section replacement as described herein.

40. The Roof Replacement Project was completed on or about June 14, 2022, at a total cost of $4,242,953.75. The amount included within the total that was attributed to microbial growth remediation and that was tracked on a time and materials basis was $839,004.00.

### Berkshire's Claim on the Policy

41. On or about September 29, 2021, following Berkshire's discovery of the microbial growth within the Roof Cavity and on the roof decking (sheathing) of the Original Roof, Berkshire notified Sompo in writing of a claim against the Policy (the "Claim"). A copy of the Claim is attached hereto as Exhibit "B" and incorporated herein by reference.

42. On or about December 20, 2021, Sompo acknowledged Berkshire's Claim that "[m]old and water damage has been identified on and under the roof of the building, requiring replacement of the roof and remediation of any mold conditions identified" at the Property and agreed "to provide coverage for this claim under the Policy subject to the following reservation of rights and the $50,000 [Self-Insured Retention]." A copy of Sompo's Claim acknowledgement is attached hereto as Exhibit "C" and incorporated herein by reference.

43. Pursuant to Section I.C.1 of the Policy, Sompo is obligated to pay Berkshire "**Cleanup Costs**" for Biological Agent Conditions "up to the Limits of Liability and in excess of the Self-Insured Retention." (Exh. "A"; bold in original).

44. Pursuant to Section VIII.10, "**Cleanup Costs**" are defined, in part, as "the reasonable and necessary costs incurred in performing **Corrective Actions** and/or **Restorative Actions** at, upon, within, under or migrating from a **Scheduled Location**." (Exh. "A"; bold in original).

45. Pursuant to Section VIII.11, "**Corrective Actions** " are defined, in part, as "actions undertaken with the prior written approval of the Company to investigate, test, sample, monitor, cleanup, remove, remediate, treat, dispose of, neutralize or immobilize **Pollutants** resulting from a **Pollution Condition(s)** or **Biological Agents** resulting from a **Biological Agent Condition(s)**." (Exh. "A"; bold in original).

46. Pursuant to Section VIII.41, "**Restorative Actions** " are defined as "actions undertaken with the prior written approval of the Company to repair, replace or restore tangible property to substantially the same condition such tangible property was in prior to being damaged during work performed in the course of incurring **Cleanup Costs**. The cost of **Restorative Actions** at a **Scheduled Location** shall not exceed the diminution in value of the **Scheduled Location** as a result of the **Pollution Condition(s)** or **Biological Agent Condition(s).**" (Exh. "A"; bold in original).

47. In a letter dated July 20, 2022, Berkshire reiterated to Sompo that "the Project included (i) the demolition of the existing roof and degraded roof substrate which was necessary to investigate, locate, test and remediate the microbial growth, and (ii) the replacement in kind of the damaged substrate and roof membrane to substantially the same condition as existed prior to the discovery of the microbial growth." Berkshire argued that the full amount of $839,004.00 documented as having been incurred in connection with the microbial growth remediation should be covered as a Cleanup Cost. Berkshire also argued that the full amount of $3,403,949.75 incurred to remove and replace the Original Roof should be covered as a Restorative Action because the only way to access the microbial growth that required remediation was by first removing and replacing the Original Roof, and these were actions taken to repair, replace, or restore

property that was damaged during work performed in the course of incurring the microbial growth remediation costs. A copy of the referenced letter is attached hereto as Exhibit "D" and incorporated herein by reference.

48. In its coverage determination letter dated October 21, 2022, Sompo initially denied that Berkshire was entitled to the full amount of $839,004.00 documented as having been in incurred as Cleanup Costs in connection with the microbial growth remediation. In so doing, Sompo arbitrarily eliminated reasonable and necessary costs such as contractor profit and overhead and imposed a weekly equipment rental rate rather than a daily rate. Additionally, Sompo denied that Berkshire was entitled to recover any amounts whatsoever for the removal and replacement of the Original Roof as a Restorative Action, claiming the cause of the microbial growth excused its coverage obligation and that the roof had no value, neither of which are germane to the policy language or coverage analysis. A copy of the referenced letter is attached hereto as Exhibit "E" and incorporated herein by reference.

49. By letter dated November 4, 2022, Berkshire rejected Sompo's coverage determination and demanded that Sompo acknowledge its complete coverage obligation by paying the full amount of $4,242,953.75 submitted in connection with the Clean Up Costs and Restorative Actions. In particular, Berkshire stated that Sompo's failure to provide an "explanation of how the insured could have or should have accessed the covered condition without removing and replacing the roof is further proof that both were necessary and covered as Restorative Actions." A copy of the referenced letter is attached hereto as Exhibit "F" and incorporated herein by reference.

50. By letter dated December 5, 2022, Sompo revised its position on the microbial growth remediation costs and stated that it "recognizes the entire $839,004 of invoices attributable to mold remediation, and will make payment of $789,004, after applying the $50,000 retention." A copy of the referenced letter is attached hereto as Exhibit "G" and incorporated herein by reference.

51. By letter dated December 22, 2022, Sompo reiterated its rejection of the remainder of Berkshire's claim by arguing (erroneously) that "Berkshire's roof replacement costs are not eligible for coverage as 'Restorative Actions' because the roof was not damaged in connection with mold remediation efforts as is required by the referenced policy's . . . definition of that term." A copy of the referenced letter, hereinafter referred to as the "Final Rejection Letter," is attached hereto as Exhibit "H" and incorporated herein by reference.

52. The consideration of whether the Original Roof was "damaged in connection with the microbial growth remediation efforts" is neither relevant to nor permitted by the express terms of the Policy.

53. Sompo argues that "because the roof was being removed and replaced, thereby providing open access to the structural members supporting the roof, this was the most convenient way to allow for access for any mold remediation efforts that might be required as mold was encountered." (Exh. "H").

54. The consideration of the "most convenient way to allow access for any mold remediation" may be relevant to the *quantum* of the claim or as a potential failure to mitigate defense, but it not relevant to the determination of coverage in the first instance.

55. Importantly, Sompo <u>admits</u> that some level of Restorative Actions would have been covered to access the mold that had to be remediated. Sompo states, "[h]ad the roof repair not been necessary, and the only issue at the insured premises was the presence of mold in the building's interstitial space, it is likely that an alternate remedial approach could have been pursued that would not have required the insured to gain access through the roof." (Exh. "H"). However, Sompo merely speculated about a potential alternate remedial approach and offered no such alternative itself.

56. Thus, Sompo's coverage rejection is based not on the terms of the Policy, but instead on the *quantum* of Berkshire's claim and Sompo's mistaken belief that Berkshire should have or could have used "an alternate remedial approach" – i.e., a less costly approach – to access the mold within the Roof Cavity that Sompo has conceded was a covered condition that required remediation. In fact, there was no such cost-effective alternative approach as the only other potential way to access the microbial growth in the Roof Cavity would have been to penetrate the Roof Cavity from below ( i.e., through the ceiling of each of the approximately 55 apartment units on the sixth floor), then remove the blown-in insulation to locate areas where the microbial growth existed within the dark cavity, and then attempt to remediate the microbial growth in extremely cramped conditions while having to avoid fire sprinkler systems and heads, electrical conduit and fixtures, ductwork, and roof trusses. Notably, this approach would have required the removal of the entire ceiling and hallway corridors, removal and restoration of the blown-in insulation, replacement of the ceiling, displacement of the occupant or occupants of each unit for the period of time required to perform this alternative approach,

Case 3:23-cv-00069-FDW-DCK   Document 1   Filed 02/06/23   Page 12 of 15

12

and temporary housing for occupants, and protection to the personal property contents of each unit, all at a considerably greater cost and disruption to the occupied building.

57. Berkshire will present evidence that not only would it have been more costly to access the microbial growth within the Roof Cavity in any way other than through the Original Roof (as Berkshire did), but it would also have been impracticable, if not impossible, to fully fill the Roof Cavity with blown-in insulation from the underside of the Roof Cavity so that it could satisfy Building Code draftstopping requirements as originally designed. Moreover, relocation of the tenants would jeopardize existing tenant relationships and stigmatize the marketing of the building to future tenants.

58. Therefore, regardless of whether the Original Roof had to be replaced for other reasons -- another consideration which is neither relevant to nor permitted by the express terms of the Policy -- the most practical and cost effective way to access the microbial growth within the Roof Cavity was always through the Original Roof, and all costs associated with removing and replacing the Original Roof should have been covered as Restorative Actions under the Policy.

59. Contrary to Sompo's position in its Final Rejection Letter, the only "betterment" included with the new roof as compared to the Original Roof was the addition of the vapor barrier. Berkshire is not seeking the material costs of the vapor barrier in its claim against Sompo under the Policy.

## Count for Declaratory Judgment

60. The allegations contained in preceding paragraphs are incorporated herein by reference as if fully set forth.

61. There is no dispute that Berkshire, as "**Insured**," has timely submitted a "**Claim**" within the "**Policy Period**" of the Policy seeking coverage for "**Cleanup Costs**" for "**Biological Agent Condition(s)**" at a "**Scheduled Location**," as those bolded terms are used and defined within the Policy.

62. The only dispute for resolution by this Court is whether any of the additional costs incurred and claimed by Berkshire constitute **Restorative Actions** "to repair, replace or restore tangible property to substantially the same condition such tangible property was in prior to being damaged during work performed in the course of incurring **Cleanup Costs**." (Exh. "A," Section VIII.41).

63. Berkshire seeks a declaration from this Court that additional costs claimed by Berkshire but denied by Sompo are covered by the Policy and that Sompo owes Berkshire reimbursement therefor.

**WHEREFORE**, Berkshire prays for the following relief:

1. That the Court declare the rights, duties, and obligations of the parties in connection with the Policy;

2. That the Court declare that additional costs claimed by Berkshire but denied by Sompo are covered by the Policy and that Sompo owes Berkshire reimbursement therefor;

3. That Berkshire have a recover a judgment against Sompo for all costs incurred Berkshire that were denied by Sompo but declared by this Court to be covered by the Policy in the principal amount of at least $3,403,949.75, plus post-judgment interest thereon at the legal rate, plus the costs of this action; and

4. That the Court grant such further relief which this Court deems just and proper.

/s/ Andrew L. Chapin

Andrew L. Chapin
North Carolina Bar No. 25794
achapin@cgspllc.com
CONNER GWYN SCHENCK PLLC
P.O. Box 20744
Greensboro, North Carolina  27420
Phone: (336) 691-9222
Facsimile: (336) 691-9259

Counsel for Plaintiff
Berkshire Group LP